UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | No. 16 CR 590 |
| MARCO PROANO | Judge Gary Feinerman |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorney, Joel R. Levin, Acting United States Attorney for the Northern District of Illinois, respectfully submits its sentencing memorandum in this matter. The government requests that this Court impose a term of imprisonment of approximately 8 years on defendant Marco Proano.

Such a sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). It would reflect the seriousness of defendant's conduct—firing 16 times at a car full of teenagers, each one of whom could have been killed by defendant's bullets. It would account for defendant's personal characteristics—that by firing his weapon indiscriminately on December 22, 2013, defendant abused his power as a Chicago police officer, and that defendant has yet to express any remorse for his actions. And it would address the need for deterrence, by sending a clear message to law enforcement (and the community) that if officers violate the constitutional rights of the very same individuals they are sworn to serve and protect, they will be prosecuted and punished to the fullest extent of the law.

1

## I.     Background

### A.     Offense Conduct

On December 22, 2013, defendant, a Chicago police officer, was patrolling in the area of 95th and LaSalle on the city's South Side.  At approximately 5 p.m., he and his partner, Officer Guy Habiak, heard a call for assistance from another officer, Ken Flaherty.  Officer Flaherty reported a possibly stolen vehicle and a foot chase. Defendant and his partner responded to the call, and moments later, arrived at 95th and LaSalle in their marked squad car.  A dashboard camera mounted on that car captured defendant's arrival and later discharge of his firearm.

After defendant arrived, he got out and stepped in front of his squad car, immediately drew his firearm with one hand, cocked it sideways, and aimed it at the suspected stolen vehicle, a Toyota.  Before defendant was on the scene, the Toyota had become wedged in between Officer Flaherty's squad car and a parked car.  Inside the Toyota were six teenagers.  Five teenagers were in the back seat, including David Hemmans, Delquantis Bates, and Kevon.  The sixth teenager, Jaquon Grant, was partially in the front passenger seat.  No one was in the driver's seat.  The driver had fled the Toyota before it came to a complete stop and before defendant had arrived on the scene.

Over the next five seconds (a length of time made clear from the time stamps on the dash-cam video), defendant aimed his gun at the Toyota.  There is no evidence that he used verbal commands before drawing his weapon.  As defendant pointed his gun at the Toyota, some of its passengers tried to exit the Toyota and flee the scene,

but without success. The front-seat passenger, Jaquon Grant, had become wedged in between the Toyota and Officer Flaherty's squad car; he called for help as he tried to free his wedged leg. The passenger positioned at the rear driver's side of the Toyota, 13-year-old Kevon, also attempted to exit the Toyota. But Kevon, too, could only partially exit the Toyota because it was positioned too closely to the parked vehicle.

After those approximately five seconds passed, two things happened at essentially the same time. First, one of the rear-seat passengers, Delquantis Bates, jumped forward from the backseat, stretched his body across the front seat of the car, put the Toyota into reverse, and pressed his hand on the gas pedal. The Toyota then reversed. As it did, a BB gun fell from Jaquon Grant to the ground. Officer Habiak immediately recovered the BB gun and handed it to Flaherty, who put it in his pocket.

When the Toyota reversed, defendant began firing in its direction. No pedestrian or officer was in the Toyota's path. No one fired or aimed a gun at defendant. The shots were fired in a residential neighborhood on a Sunday evening, a few days before Christmas. In statements he later made to Detective Stanley Kalicki and in use-of-force reports he completed that night, defendant claimed (and still maintains) that he fired 16 times because he believed Kevon, the rear driver's side passenger, was in danger of being dragged by the Toyota. In other words, defendant tried to justify his use of deadly force by stating that in order to save one of the Toyota's passengers he fired his gun in the Toyota's direction.

The evidence presented at trial did not support this rationale. Although the dash-cam video shows that the Toyota began to reverse while Kevon remained half-

in and half-out of the car, there is no evidence that Kevon was being dragged by the Toyota.  Instead, the dash-cam video shows Kevon's head and shoulders above the Toyota's roofline as the car reversed.  And Kevon never testified that he was dragged by the car.  Kevon instead testified that he got out of the Toyota just before it stopped reversing.  As the Toyota then pivoted and began to roll forward, Kevon testified that he ran alongside it, using the Toyota to shield himself from defendant's bullets.  This testimony was corroborated by the dash-cam video, which shows Kevon's feet hitting the ground as he hopped out of the Toyota.[1]  In short, defendant continued to fire at the Toyota even after the alleged threat he perceived—the threat to Kevon's safety—was no longer an issue.

As further established at trial, in part through Delquantis' testimony, Delquantis took his hand off the gas pedal after defendant started firing and Delquantis felt bullets scrape his face.  In the backseat, Delquantis told the jury, he balled up, crouched down, and raised his arms over his head to protect himself from the gunfire.  As a result, no one was driving the Toyota when it rolled slowly to a stop against the light pole.  Delquantis' testimony was corroborated by the dash-cam video, which showed the Toyota pivoting and slowly moving forward after Delquantis returned to the back seat.  This evidence contradicts defendant's position at trial (and his statement to the probation officer as part of these sentencing proceedings) that he shot at Delquantis in order to stop the Toyota.  *See* PSR ¶ 20; Def.'s Vers. of the Offense at 2.  Defendant could not have been shooting at Delquantis to stop the

---

[1]  *See* Gov. Ex. 1 at 00:25:28+.

Toyota if Delquantis was no longer in control of the Toyota. Moreover, were defendant really aiming and shooting specifically at Delquantis, his bullets would not have entirely missed the Toyota or entered the Toyota in the scattershot nature outlined by Sergeant Kevin Norris at trial. As Sergeant Norris testified, of the 16 shots defendant fired, only ten pierced the Toyota. Of those ten bullets, one entered the Toyota through the front windshield, four entered through the front, passenger-side panel, two entered through the front passenger-side door, and three entered through the rear passenger-side door. As Sergeant Norris further testified, one bullet was recovered from the floorboard near the rear, driver's side passenger seat, inches from where Kevon had been sitting.

As the dash-cam video depicts and trial testimony established, defendant fired at the Toyota as it reversed, as it pivoted, as it began moving forward, and as it slowly came to a stop, clearly no longer a threat to anyone. Defendant fired 16 shots over the course of 9 seconds, the amount of time that passed between his first shot (clearly depicted on the video) and the time he reached to reload his weapon, as he was trained to do immediately upon emptying his magazine. Defendant was the only officer on the scene to fire his weapon.[2]

---

[2] According to the PSR, "several [officers] had their weapons out of the holster." PSR ¶ 14. At the sentencing hearing, the government will seek to have this language in the PSR stricken or at least clarified. There were only two other officers on the scene at the time defendant fired his weapon, and there is no evidence that either of those officers "had their weapons out of the holster" at the time defendant fired. To the extent the PSR is referring to officers who arrived on the scene after the shooting was finished, and who drew their weapons at that time, the PSR should be amended to make that clear.

5

Two teenagers in the vehicle were struck by defendant's gunfire: (1) David Hemmans (Victim A), who sustained gunshot wounds to his right ankle and left thigh; and (2) Delquantis Bates (Victim B), who sustained a gunshot wound to his right shoulder, and three bullet graze wounds on his face.

## B.     Procedural History

On September 15, 2016, the grand jury returned a two-count indictment against defendant. Dkt. No. 1. It charged defendant with, on or about December 22, 2013, depriving Victim A (Hemmans) and Victim B (Bates) of their constitutional rights—specifically, the right to be free from the use of unreasonable force by a police officer, protected by the Fourth Amendment as incorporated against the states by the Fourteenth Amendment. *Id*. It also charged that defendant's actions resulted in bodily injury to both victims and included the use of a dangerous weapon. *Id*.

On August 28, 2017, following a trial, a jury convicted defendant on both counts. Dkt. No. 132. In so doing, the jury unanimously found that Hemmans and Bates had suffered bodily injuries as a result of defendant's acts and that those acts included the use, attempted use, or threatened use of a dangerous weapon. Dkt. Nos. 131-32. In convicting defendant, the jury rejected arguments expressly made by defendant through cross-examination and his closing argument, but which re-appear in his version of the offense as well as the Presentence Investigation Report (PSR) prepared by U.S. Probation. *See, e.g.*, PSR ¶ 17 (according to defendant, another officer "yelled that he had observed a firearm in the vehicle"); PSR ¶ 19 (according to defendant, the dash-cam video does not accurately reflect the relevant

6

events); Def.'s Vers. of the Offense at 1 (arguing that the "entire incident, from start to finish, was a rapidly evolving one. . . chaotic. . . unpredictable").

### C. Defendant's Background

Defendant began working for the Chicago Police Department in October 2006, and at the time of the shooting in this matter, defendant had been an officer for seven years. PSR ¶ 101. CPD has not yet formally terminated defendant, although he has not actively worked for the department since the September 2016 indictment. *Id.*

At the outset of his employment, defendant went through CPD's six-month training academy and learned about, among other things, the use of deadly force. Consistent with federal and state law, defendant was taught that he should use deadly force—such as discharging his firearm in the direction of a person—only when he reasonably believed he needed to stop an intentional threat of death or great bodily injury to others. Defendant was also trained to adjust his use of deadly force if a change in circumstances warranted it. In other words, defendant was taught that if he discharged his gun, he was to regularly re-assess whether he needed to continue discharging it. Finally, through training, defendant learned that he should not discharge his weapon into a crowd or when his intended target was not clearly visible.

During his time as an officer, defendant received several commendations and his complaint history reflects only one "sustained" complaint against him, one unrelated to his use of force. PSR ¶ 101. Defendant, however, had also been involved in three prior uses of deadly force, two of which resulted in a subject's death. *Id.* As noted in the PSR, Sergeant Larry Snelling related that "the number of shootings in

which the defendant has been involved is above average." *Id.* In the case of one such prior shooting, defendant's use of force was found justified by the Independent Police Review Authority, but a Cook County jury found him liable for his victim's wrongful death and ordered him to pay $3.5 million to the victim's family. That verdict and judgment were set aside by the trial judge, and the matter is pending on appeal. *Id.*

## II. Guideline Calculations

### A. Offense Level

Pursuant to the November 2016 Sentencing Guidelines Manual, the PSR calculates the total offense level as follows (PSR ¶¶ 31-61):

| Count One | |
|---|---|
| 14 | USSG §§ 2H1.1 & 2A2.2(a): Defendant's gunfire struck David Hemmans, causing him extreme physical pain and requiring his hospitalization following the incident. |
| 5 | USSG § 2A2.2(b)(2)(A): Firearm was discharged. |
| 5 | USSG § 2A2.2(b)(3)(B): Serious bodily injury resulted. |
| 6 | USSG § 2H1.1(b)(1)(B): defendant committed the offense under color of law. |
| 30 | *Total Offense Level for Count One* |
| **Count Two** | |
| 14 | USSG §§ 2H1.1 & 2A2.2(a): Defendant's gunfire struck Delquantis Bates, causing him extreme physical pain and requiring his hospitalization following the incident. |
| 5 | USSG § 2A2.2(b)(2)(A): Firearm was discharged. |
| 5 | USSG § 2A2.2(b)(3)(B): Serious bodily injury resulted. |
| 6 | USSG § 2H1.1(b)(1)(B): defendant committed the offense under color of law. |
| 30 | *Total Offense Level for Count Two* |

| Grouping & Acceptance | |
|---|---|
| +2 | USSG § 3D1.2(d): Counts One and Two are not grouped, and there are two equally serious counts. |
| -0 | USSG § 3E1.1: Defendant has not clearly demonstrated acceptance of responsibility for the offenses. |
| 32 | *Total Combined Offense Level* |

The government agrees with the PSR's calculation of the offense level.[3]

### B.    Criminal History

Based on facts now known to the government, defendant has two prior arrests (neither of which occurred while he was employed as a police officer) and no criminal convictions.  PSR ¶¶67-69.  Defendant's criminal history points thus equal zero.

### C.    Advisory Guidelines Range

Based upon a total offense level of 32 and criminal history category I, defendant's Guideline range is 121 to 151 month' imprisonment, adjusted to 120 months' imprisonment because the initial range exceeds the statutory maximum sentence of 10 years' imprisonment.  PSR ¶ 112.

As noted above, Counts One and Two are not grouped under the Guidelines. Had these two counts grouped (i.e., if defendant's offense behavior were viewed as ongoing or continuous in nature and the offense was not specifically excluded under USSG § 3D1.2(d)), defendant's total offense level would have been 30 and the resulting Guidelines range would have been 97-121 months' imprisonment.  The low

---

[3]  Although it is reflected in the Guidelines calculations set forth in the government's version, the government is no longer seeking a two-point enhancement pursuant to  USSG § 3C1.1 for obstruction of justice.

end of that range represents approximately 8 years' imprisonment.

In addition, the Guideline range for a fine is $17,500-$750,000. PSR ¶123. As set forth in the PSR, defendant may have the ability to pay a fine. PSR ¶111.

### III. In Light of the Factors Set Forth in 18 U.S.C. § 3553(a), the Court Should Sentence Defendant to a Term of Imprisonment of Approximately Eight Years.

The government asks that this Court impose on defendant a below-Guidelines sentence that includes a term of imprisonment of approximately 8 years. Such a sentence is fair and reasonable in light of the § 3553(a) factors, particularly, the nature and circumstances of the offense, defendant's history and personal characteristics, the need to afford adequate deterrence, and the need to avoid unwarranted sentencing disparities.

#### A. The Nature and Circumstances of the Offense

The seriousness of defendant's offense cannot be overstated. Defendant fired 16 times at a car carrying five, unarmed teenagers. Defendant could have killed each and every one of those passengers. By sheer chance, his bullets struck only two of the passengers, and through another stroke of luck for defendant, those passengers survived.

David Hemmans sustained through-and-through gunshot wounds to his right ankle and left thigh, and Delquantis Bates sustained another through-and-through gunshot wound to his right shoulder, as well as bullet graze wounds to his face. Both victims have now recovered from their gunshot wounds, but as David McElmeel, the trauma surgeon who treated both David and Delquantis, testified at trial, both

10

victims could have easily ended up dead owing to defendant's actions.

The seriousness of the offense is compounded by jurors' rejection of defendant's efforts to rationalize his conduct. At trial, defendant repeatedly argued that his use of force was reasonable and warranted in light of his seeming understanding of Illinois law, the danger he allegedly perceived Kevon to be in, and the "split second" nature of the decision that defendant maintained he was forced to make. In convicting defendant, the jury rebuffed these pretexts, thus leaving only one explanation for the decision defendant made—on 16 separate occasions—to shoot to kill. As the government contended in its closing arguments, defendant came out of his squad car moments after arriving on the scene, immediately drew his gun, cocked it sideways, and aimed at it those teenagers to send them a message and show them who was in charge. And when they didn't listen, he fired, again and again and again, 16 times in total. Defendant shot, in other words, without cause or justification and in disregard of the principles he learned at the academy, never once stopping to re-asses the need for force. *See United States v. Livoti*, 196 F.3d 322, 329 (2d Cir. 1999) (district court did not err in considering, when sentencing officer in a § 242 case, that defendant had "deliberately disregarded NYPD safety regulations" and "flouted direct orders and department policy").

By acting in this manner, defendant added another dimension to the seriousness of his offense. Defendant gave the community reason to doubt law enforcement's intentions and reason to believe that it cannot have faith that law enforcement will serve all citizens equally. As Kevon testified, when he sees the

police, he doesn't stop or ask for help—he runs. That long-ingrained distrust of the police did not start with defendant's use of excessive force, but his conduct exacerbated that mistrust. Defendant's irresponsible actions impugned the integrity of the many other hard-working, dedicated, and responsible Chicago police officers who go to work every day and fulfill their oath to serve and protect.

### B. Defendant's History and Personal Characteristics

This Court should not treat defendant's past work as a police officer as a mitigating circumstance when sentencing him. Sworn law enforcement officers should be held to a higher standard of conduct. They are given much power and much responsibility, and our community relies on them to uphold and enforce the law, and to use force, in a manner that shows equal respect for every individual's rights under the Constitution. Defendant's failure to demonstrate the honor and integrity expected of law enforcement is but one reason why this Court should impose on him a significant term of imprisonment. *See United States v. Thames*, 214 F.3d 608, 614 (5th Cir.2000) ("[W]e have noted that a defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position."); *United States v. Winters*, 174 F.3d 478, 486 (5th Cir. 1999) (rejecting defendant's request for a downward departure on the basis that he was a law enforcement officer, finding that this would thwart the intent of the Guidelines, which apply greater, not lesser, sentences for criminal conduct by law enforcement).

Defendant's lack of remorse is another reason this Court should sentence

12

defendant to a substantial term of imprisonment. To date, defendant has yet to accept responsibility for his actions—to acknowledge the harm, both physical and otherwise, that he caused David and Delquantis, and to recognize the broader consequences of his actions. A guilty verdict notwithstanding, defendant continues to try and justify his actions. *See* Def.'s Vers. of Offense at 1-3 (arguing that his decision to shoot was justified because the relevant events were "rapidly evolving," "chaotic," and "unpredictable" and that the video evidence presents an "overly restrictive view of the totality of the circumstances"). He sees himself as the victim here. PSR ¶ 90 (defendant "lamented that he felt a sense of 'betrayal' because he served the community for many years, and is now 'left out in the cold'"). Defendant's lack of remorse runs so deep he will not even concede that, consistent with his training, he at least should have been holding his gun with both hands at all times, including when he first emerged from his squad car. PSR ¶ 18 (defendant states that he held his gun "with a single hand pointed toward the [Toyota] at an angle" as "a tactical response based on the fact that he is left handed, and was coming around from the left side of his vehicle").

In *United States v. Smith (Smith II)*, 860 F.3d 508, 517 (7th Cir. 2017), the appeals court found error when the district court discounted the sentence it imposed on a defendant convicted under § 242 because "the record [was] devoid of any actual expression of acceptance of responsibility or remorse" by defendant. There, defendant "never mentioned his victims or his crimes," he "did not concede the facts of his offenses of conviction[,] and he did not express regret for anything other than the

13

length of a . . . sentence." *Id.* To the extent defendant here continues to take a similar stance, his lack of acceptance should be a reason for this Court to impose a substantial sentence, one close to the advisory Guidelines range.

Finally, defendant's family circumstances should play a limited role in the Court's analysis. Defendant is married and has three children, two of whom are still quite young. PSR ¶¶ 78-79. Yet the Seventh Circuit has explained, in a § 242 case, that "family ties and responsibilities are not ordinarily relevant in determining whether a [below Guidelines] departure may be warranted." *United States v. Smith (Smith I)*, 860 F.3d 508, 518 (7th Cir. 2017). "Mitigation arguments that rely on the effects of incarceration on defendant's children must identify consequences that go beyond those that any child would suffer when a parent is imprisoned." *Id.* Absent any such "[e]xtraordinary family circumstances," there is no "legitimate basis" for departing significantly from the Guidelines. *Id.*

## C.     The Need To Afford Adequate Deterrence

The need for specific deterrence is a lesser consideration in this case because defendant cannot continue to work as a police officer or carry a firearm as a convicted felon. But general deterrence remains important in selecting an appropriate sentence for  defendant. This case presents a significant opportunity for the judicial system to send a message to law enforcement that violating the constitutional and civil rights of the very same individuals they have sworn to serve and protect is a very serious offense that will be punished to the fullest extent of the law. This is an equally important message to send to the community—to make clear to the citizens of

14

Chicago that law enforcement officers will be held just as accountable as any other criminal defendant.

To the extent that defendant argues that a deterrent effect has already been achieved through the publicity this case garnered, this argument should be rejected. *See United States v. Warner*, 792 F.3d 847, 862 (7th Cir. 2015) (the publicity surrounding defendant's prosecution deserved "little, if any, weight" at sentencing).

### D.   The Need To Avoid Unwarranted Sentencing Disparities

Under § 3553(a)(6), in sentencing defendant, a district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But as the Seventh Circuit has explained, "the Sentencing Guidelines are themselves an anti-disparity formula" because the Sentencing Commission considers the need to avoid unwarranted disparities when setting the Guidelines ranges. *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). "A sentence within a Guideline range necessarily complies with § 3553(a)(6)." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).

In the Northern District of Illinois, defendants in other § 242 cases generally have received sentences within or slightly below the advisory Guidelines range. *See, e.g.*, *United States v. Micetich*, 15 CR 397 (defendant received a 24-month sentence when the Guidelines range was 21-27 months); *United States v. Munoz*, 14 CR 696 (defendant charged with a § 242 misdemeanor sentenced to a 12-month term of imprisonment, which was the maximum sentence available); *United States v. Aldo*

15

*Brown*, 14 CR 674 (defendant received a 24-month sentence where Guidelines range was 24-30 months); *United States v. Fletcher*, 11 CR 478 (defendant sentenced to a 75-month term of imprisonment where Guidelines range was 87-108 months).[4]

To be sure, there are § 242 cases in which defendants have received sentences substantially below the advisory Guidelines range, but at least two courts of appeals—including the Seventh Circuit—have vacated such sentences as procedurally unsound or substantively unreasonable. In *Smith II*, 860 F.3d at 510, the Seventh Circuit vacated and remanded for a complete re-sentencing—for a second time—a case involving a law enforcement officer convicted under § 242. Defendant Terry Joe Smith was a police officer who "[i]n two separate incidents . . . violently assaulted arrestees who were already under control and not actively resisting." *Id.* He punched one arrestee "in the face with a closed fist, causing bleeding and swelling on his face"; he "drove his knee into [the second arrestee's] back with such force that the man defecated himself." *Id.* Smith's Guidelines range was 33 to 41 months, but the district court sentenced him "to a fourteen-month term, less than half the bottom end of the guidelines range." *Id.* at 511. After finding that the district court had failed to justify the below-Guidelines sentence, the appeals court vacated and remanded the matter for re-sentencing. On remand, "the court again sentenced Smith to fourteen months' imprisonment and once more failed to adequately explain or justify the below-guidelines sentence." *Id.* at 510. The Seventh Circuit again vacated and remanded the matter for a complete re-sentencing, noting that "[i]f there

---

[4] In *United States v. Zamiar*, 13 CR 929, defendant received a 15-month term of imprisonment despite a Guidelines range of 87-108 months.

is a rationale to support a sentence that is less than half the low end of the guidelines, it is not apparent in the record" and that "the farther down the judge goes the more important it is that he give cogent reasons for rejecting the thinking of the Sentencing Commission." *Id.* at 519-20.[5]

In *United States v. Dautovic*, 763 F.3d 927, 932, 935 (8th Cir. 2014), the Eighth Circuit found a 20-month sentence, in a § 242 case where the Guidelines range was 135-168 months' imprisonment, to be substantively unreasonable and remanded for resentencing.[6] Among other factors in its sentencing calculus, the district court in *Dautovic* had "specifically call[ed] into question the six-level color-of-law enhancement" and had considered statistics for civil rights offenses for the years 2008 to 2012 put forth by the U.S. Sentencing Commission. According to those statistics, "[t]he average length of a sentence for those years ranged from 22.5 months to 39.1 months (mean) and from 8 months to 14.5 months (median)." *Id.* at 932-33. The appeals court rejected the district court's decision to depart from the Guidelines by 115 months, finding such a sentence "unreasonably lenient." *Id.* at 935. And *Dautovic* specifically criticized the district court's efforts to avoid an unwarranted sentencing disparity "by basing Dautovic's sentence on the average sentence imposed for civil rights violations." *Id.* It wrote:

> [W]e are not convinced that the U.S. Sentencing Commission surveyed defendants whose records and offense conduct were similar to Dautovic's. . . . Section 242 criminalizes a variety of offense conduct, ranging from nonviolent misdemeanors to violent felony offenses, but

---

[5] This second re-sentencing is currently scheduled for November 20, 2017.

[6] In addition to being convicted under § 242 for the use of excessive force, the defendant in *Dautovic* was also convicted for obstruction of justice under 18 U.S.C. § 1519.

the statistics addressed only civil rights violations in general, not offense conduct.

*Id.*

In this case, the government's recommendation of an 8-year term of imprisonment is reasonable, and not greater than necessary, in light of the advisory Guidelines, the § 3553(a) factors in this matter, and sentences imposed in other § 242 cases. The district court cases that the government referenced earlier—*Micetich*, *Munoz*, *Brown*, and *Fletcher*, in which the within-Guidelines sentences ranged between 12 and 75 months—all involved incidents where defendants punched, kicked, or hit their victims using a baton. In other cases involving similar underlying facts—i.e., assaults committed through batons or beatings, but not firearms— defendants were sentenced to terms of imprisonment ranging from 27 to 205 months. In particular, the government points this Court to the following cases:

- *United States v. Cozzi*, 613 F.3d 725 (7th Cir. 2010). A police officer used a weapon known as a "sap," commonly a leather impact weapon weighted with lead on at least one side, to beat an arrestee. Defendant was sentenced to 40 months' imprisonment.

- *United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009). Three police officers were convicted of severely beating, kicking, and otherwise brutally assaulting two people they suspected of having stolen the badge of one of the officers. Two of the officers were sentenced to 188 months in prison, and the third was sentenced to 208 months.

- *United States v. DiSantis*, 565 F.3d 354 (7th Cir. 2009). A police officer struck a bystander who was filming a traffic stop by the officer, hitting the man on the head and face with the man's camera, then throwing the camera on the ground and stomping on it, and finally patting the man down and squeezing his genital. He was sentenced to 66 months in prison.

- *United States v. Christian*, 342 F.3d 744 (7th Cir. 2003). A police officer kneed and punched a suspect in the face after the suspect hurled insults at him, including a racial epithet. He received a 33-month sentence.

- *United States v. White*, 68 F. App'x 707 (7th Cir. 2003). A police officer struck a woman, causing bruises, a laceration of her lip, and a hole in her cheek that required stitches inside and outside her mouth. That defendant was sentenced to 27 months in prison.

- *United States v. Boone*, 828 F.3d 795 (8th Cir. 2016). A police officer kicked victim directly in the face, causing victim's head to jerk back in a "whiplash motion." Defendant was sentenced to 63 months' imprisonment.

- *United States v. Gould*, 672 F.3d 930 (10th Cir. 2012). A lieutenant and shift leader at a county detention center joined other officers who were assaulting an inmate. He specifically pepper-sprayed and assaulted the victim and then filed a false report about the incident. Defendant was later sentenced to 97 months' imprisonment.

In each of these cases, save *Bartlett*, defendants received terms of imprisonment ranging up to 8 years' imprisonment. In *Bartlett*, of course, defendants received substantially more time. And yet none of these cases involved the type of deadly force at issue here, the discharge of a firearm, let alone 16 separate discharges of that gun capable of killing 16 children.

One § 242 case that did involve the discharge of a firearm was *United States v. Hunter*, 10 CR 86, from the Eastern District of Louisiana. In *Hunter*, a New Orleans police officer was among several officers who shot at unarmed, fleeing civilians shortly after Hurricane Katrina. That defendant discharged his weapon, and witnessed other officers shoot and strike civilians; he later conspired to obstruct and cover up that offense. After pleading guilty to a conspiracy and misprision of a felony, that defendant was sentenced to 60-month and 36-month terms of imprisonment,

19

respectively, with the terms running consecutively. In other words, the defendant received an 8-year term of imprisonment.[7]

## IV. This Court Should Adopt the Supervised Release Conditions Outlined in the PSR

Under 18 U.S.C § 3583(b)(2), the Court may impose a term of supervised release of not more than three years for each count. PSR ¶ 115. Under the Guidelines, the Court may impose a term of supervised release of one to three years. PSR ¶ 117. The government asks that the Court impose a three-year term of supervised release per count, with the terms to run concurrently.

The government further requests that defendant be required to comply with the following mandatory conditions set forth in 18 U.S.C. § 3583(d):

- Not commit another federal, state or local offense.

- Not unlawfully possess a controlled substance.

- Cooperate with the collection of a DNA sample if the collection is authorized by law.

The government further recommends the following conditions because they serve to facilitate supervision by the probation officer, support defendant's rehabilitation and reintegration into the community, and promote deterrence and protect the public:

- Provide financial support to any dependents if financially able.

- Seek and work conscientiously at lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment.

---

[7] Defendant later cooperated for a reduced sentence.

- Refrain from knowingly meeting or communicating with any person whom defendant knows to be engaged, or planning to be engaged, in criminal activity.

- Refrain from excessive use of alcohol or any use of a narcotic drug or other controlled substance, without a prescription from a licensed medical practitioner.

- Refrain from possessing a firearm, destructive device, or dangerous weapon.

- Remain within the jurisdiction where defendant is being supervised, unless granted permission to leave by the court or a probation officer.

- Report to a probation officer as directed by the Court or a probation officer.

- Permit a probation officer to visit defendant at any reasonable time at home, work, or other reasonable location specified by a probation officer, and permit confiscation of any contraband observed in plain view of the probation officer.

- Notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent conditional or other legal privilege, answer inquiries by probation officer.

- Notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

In light of the ongoing need to support defendant's rehabilitation and reintegration into the community, protect the public, promote deterrence, and ensure that the probation officer can satisfy her duty to remain informed about defendant, the government concurs with the PSR's recommendations that the Court impose the following special conditions of supervision. These conditions do not involve a deprivation of liberty greater than reasonably necessary to achieve the statutory goals of supervision:

- If unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20

hours of community service per week at the direction of the U.S. Probation Office until gainfully employed, with the amount of community service not exceeding 400 hours.

· Not incur new credit card charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.[8]

· Provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release.

· Notify the Court of any material change in defendant's economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

· Pay any financial penalty that is imposed by this judgment that remains unpaid at the commencement of the term of supervised release. Defendant's monthly payment schedule shall be an amount that is at least 10% of his net monthly income, defined as income net of reasonable expenses for basic necessities such as food, shelter, utilities, insurance, and employment-related expenses.

· Not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

---

[8] This and the next three conditions of supervised release are recommended by the government should the Court deem a fine appropriate in this case.

22

## V.    Conclusion

For the reasons set forth above, the government asks that this Court sentence defendant to a term of imprisonment of approximately 8 years.

Respectfully submitted,

JOEL R. LEVIN
Acting United States Attorney

By:    /s/ *Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
ERIKA L. CSICSILA
Assistant United States Attorneys
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

Dated: October 23, 2017