IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 16 CR 590 |
| v. | ) | |
| | ) | Judge Gary Feinerman |
| MARCO PROANO | ) | |

## MARCO PROANO'S SENTENCING MEMORANDUM

Defendant, Marco Proano ("Proano") by and through his attorney, DANIEL Q.

HERBERT & Associates, respectfully submits this sentencing memorandum:

### I.     Presentence Report ("PSR")

*Details from Defendant Proano*

17.     Defendant seeks to clarify the information contained in paragraph 17. At the time Mr. Proano arrived on scene, the driver of the possible stolen vehicle had fled and another police officer gave chase. The occupant in the backseat positioned himself in the front seat, using his hand to push on the accelerator. Initially, the vehicle did not move. At the point that the stolen vehicle fled in reverse, a gun fell from Mr. Grant and hit the ground.

*Details from Sergeant Snelling and Agents*

23.     Defendant objects to the information obtained from Sergeant Snelling, particularly Sergeant Snelling's statement that Mr. Proano fired at a vehicle that was not an immediate threat to anyone. This is Sergeant Snelling's opinion based on watching the video at a slowed down pace and picking apart every aspect of Mr. Proano's use of force. Mr. Proano, however, did not have that luxury. Additionally, Mr. Proano objects to Sergeant Snelling's assertion that he fired too many rounds without stopping to reassess the situation and determine if a different course of action was more appropriate. Snelling testified at the trial that officers are trained to fire until the threat is eliminated. Here, the threat was not eliminated until the vehicle was no longer being used as a weapon, at which point Mr. Proano stopped firing. Moreover, Sergeant Snelling serves as a physical skills instructor at the Chicago Police Academy and has never instructed recruits about use of force in a situation with a fleeing vehicle. His statement about firing could only come from a range instructor, which Sergeant Snelling is not.

24.     Defendant objects to the information contained in paragraph 24. As an initial matter, Defendant did not shoot several rounds in the direction of Mr. Brown.

Additionally, Defendant objects to Sergeant Snelling's opinion that it was possible that other officers upholstered their weapons in response to Defendant's discharging his firearm, assuming that his assessment of the situation merited it, and not necessarily because what they observed merited it. Again, this is opinion testimony and Sergeant Snelling cannot speak to other officers' actions. What is more, the evidence showed that the threat was eliminated as a result of Mr. Proano's use of force.

25. Defendant was given the opportunity to speak with FBI Special Agents Haralson and Corbett, however, Defendant elected to have his Attorney, Mr. Herbert, speak with the Special Agents on his behalf.

**Victim Impact**

26. Defendant objects to the government's victim impact statement, especially those statements attributed to Mr. Kevon Brown. Mr. Brown was not a victim in this matter and Mr. Brown cannot assert the Fourth Amendment rights of Mr. Bates or Mr. Hemmans. To the extent that the government attempts to ride the wave of antipolice sentiment in its victim impact statement, Defendant asserts that the Fourth Amendment rights of the community at large were not violated and thus cannot be used as a basis to relies on the current antipolice sentiments.

## II.    **Sentencing Analysis**

### A.  **Sentencing Courts Are Required to Consider § 3553(a) Factors.**

Under *United States v. Booker,* 543, U.S. 220 (2005), as clarified by *Kimbrough v.*

*United States,* 128 S. Ct. 558 (2007), and *Gall v. United States,* 128 S. Ct. 586 (2007), sentencing

courts are instructed to consider all of the sentencing factors set forth in 18 U.S.C 3553(a),

including the nature and circumstances of the offense and the history and characteristics of the

defendant, 3553(a)(l); the need for the sentence imposed to satisfy the various goals of

sentencing, 3553(a)(2); the applicable sentencing guideline range under the United States

Sentencing Guidelines and the need to avoid unwarranted sentence disparities, 3553(a)(4) and

(a)(6); and the need to provide restitution to victims, 3553(a)(7). After considering all these

factors, the Court shall impose a sentence "sufficient, but not greater than necessary," to meet the

purposes of sentencing set forth in 3553(a)(2).

Under the Supreme Court's decision in *Booker,* the Guidelines are merely "advisory," rather than mandatory, and sentencing courts are required to consider all of the factors listed in 18 U.S.C. 3553(a) in imposing a sentence. *United States v. Booker,* 543 U.S. 220, 245-46 (2005). As the Seventh Circuit has noted, *"Post-Booker,* a district court has significantly more freedom than before *Booker* to fashion an appropriate sentence." *United States v. Baker,* 445 F.3d. 987, 991 (7th Cir. 2006). The Seventh Circuit also has made clear that district courts must consider the factors set forth in 18 U.S.C. 3553(a) in sentencing. *United States v. Dean,* 414 F.3d 725, 729 (7th Cir. 2005) ("Section 3553(a), unlike the guidelines themselves after *Booker* is mandatory."). A sentencing Court may find that based upon the sentencing factors set forth in 18 U.S.C. 3553(a), there remains some sound reason to impose a sentence outside of the Sentencing Guideline range. *See United States v. Santoya,* 493 F. Supp. 2d 1075, 1079 (E.D. Wis. 2007) (finding that the guidelines produced a term based on the defendant's prior offenses that was greater than necessary to satisfy the purposes of sentencing).

A defendant "must be given an opportunity to draw the judge's attention to any factor listed in section 3553(a) that might warrant a sentence different from the guidelines sentence, for it is possible for such a variant sentence to be reasonable and thus within the sentencing judge's discretion." *United States v. Dean,* 414 F.3d 725, 730-731 (7th Cir. 2005); see also; *United States v. Cunningham,* 429 F.3d 673, 676 (7th Cir. 2005) (stating that a sentencing judge "cannot treat all sentences that would fall within the guidelines sentencing range as reasonable per se.").

The Supreme Court has also held that "the range of choice dictated by the facts of the case is significantly broadened." *United States v. Gall,* 552 U.S. 38 (2007). Since the Guidelines are merely advisory "courts many vary [from Guidelines ranges] based solely

3

on policy considerations, including disagreements with the Guidelines." *Rita v. United States,* 551 U.S. 338 (2007). The sentencing judge is "in a superior position to find facts and judge their import under § 3553(a)" in a particular case. *Gall,* 552 U.S. at 51. The Guidelines recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve §3553(a)'s objectives." *Rita* at 346. However, the Guidelines are not the only consideration when imposing a sentence. *Gall* at 49. Since the Guidelines are merely advisory, it is well established that courts may vary from Guidelines ranges.

The Seventh Circuit has said that district judges must engage in a two-step sentencing process: (1) they must calculate the advisory guideline range, resolving any disputed guideline issues; and (2) they must then consider the § 3553(a) factors to decide whether to impose a sentence within the range or outside the range. *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006); *accord United States v. Garcia*, 754 F.3d 460, 483 (7th Cir. 2014). Under Supreme Court and Seventh Circuit law, district judges cannot simply consider the guideline range and have that be the end of the inquiry. Instead, they are also *required* to consider the § 3553(a) factors. *See United States v. Vaughn*, 433 F.3d 917, 924 (7th Cir. 2006) ("[T]here must be sufficient indication that [the district court] considered the § 3553 factors relevant to the calculation of the defendant's sentence.").

"[T]he sentencing judge may not rest on the guidelines alone, but must, if asked by either party, consider whether the guidelines sentence actually conforms, in the circumstances, to the statutory factors." *United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005); *see also United States v. Dean*, 414 F.3d 725, 728 (7th Cir. 2005) ("[N]ow that [the guidelines] are advisory, while section 3553(a) remains unchanged,

judges will have to consider the factors that the section tells them to consider."). However, "the need for a judge to explain in detail his consideration of the § 3553(a) factors when choosing to stick with the guidelines is proportional to the arguments made by the defendants. When the judge is not presented with much, he need not explain much." *United States v. Spano*, 447 F.3d 517, 519 (7th Cir. 2006) (citations omitted).

It is not enough for a judge to merely recite the 3553(a) factors. *Cunningham*, 429 F.3d at 679. The judge must also conduct some analysis of how those factors apply to the facts, and explain why a particular sentence is appropriate under § 3553(a). *Id.* at 675-76. The judge must give "an adequate statement of . . . reasons" for imposing a given sentence, *Dean*, 414 F.3d at 729, and those reasons must be "logical and consistent with the factors set forth in section 3553(a)." *United States v. Williams*, 425 F.3d 478, 481 (7th Cir. 2005). If the judge's "application of those factors to the facts of the case" is unreasonable, the Seventh Circuit will reverse. *Vaughn*, 433 F.3d at 924.

In addition to reflecting on the purposes of sentencing and the guidelines' recommendations, Section 3553(a) requires courts to consider, among other things: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) pertinent policy statements. 18 U.S.C. § 3553(a).

District courts now look to the sentencing guidelines only to guide "a wholly discretionary decision" that is exercised in reference to the sentencing factors set forth in § 3553(a). *See United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006) ("choice of sentence,

whether inside or outside the guideline range, is discretionary"); *United States v. Ngatia*, 447 F.3d 496, 501-02 (7th Cir. 2007) (same). In other words, the guidelines simply recommend a potential sentencing range, and a district court judge's "freedom to impose a reasonable sentence outside the range is unfettered." *Demaree*, 459 F.3d at 795. The sentencing court must make an individualized assessment based upon the facts presented. A sentence below the advisory guideline range is appropriate as long as the reasons for selecting that sentence "are rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency." *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

**B. Reasonableness is Not the Sentencing Standard.**

Section 3553(a) sets the sentencing standard for the district court. The Seventh Circuit has clearly held that "the statute [3553(a)] is . . . a directive to the sentencing court." *Cunningham*, 429 F.3d at 676. The district court is required to follow § 3553(a)'s primary directive in imposing sentence. Section 3553(a) states that a sentencing court "shall impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Congress's use of the word "shall" demonstrates that judges are *required* to impose the minimally sufficient sentence. In other words, even if a guideline sentence might be acceptable, § 3553(a) requires a judge to impose a lesser sentence if a lesser sentence is sufficient to meet the purposes of punishment set forth in § 3553(a)(2).

Significantly, neither the Supreme Court nor the Seventh Circuit has held that the "reasonableness" of a sentence is something to be considered by the district court in the first instance. However, the Sixth Circuit has considered the issue and found that it is not. *See* United *States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006) ("[A] district court's job is not to impose a 'reasonable' sentence. . . Reasonableness is the *appellate* standard of review in judging

6

whether a district court has accomplished its task.") (emphasis in original); *see also United States v. Davenport*, 445 F.3d 366, 370 (4th Cir. 2006) (citing and quoting *Foreman*).

Moreover, neither the Supreme Court nor the Seventh Circuit has held that the guidelines are to be accorded a presumption of reasonableness at the district court level. Under both *Booker* and Seventh Circuit law, "reasonableness" is simply the standard of review that operates on appeal. In fact, the Seventh Circuit has held that the district court "cannot treat all sentences that would fall within the guidelines sentencing range as reasonable per se." *Cunningham*, 429 F.3d at 676.

The "presumption of reasonableness" standard of review established by the Seventh Circuit simply means that if a district court decides (after considering both the guidelines and § 3553(a)), to impose a sentence within the guideline range, the Seventh Circuit will grant that sentence a rebuttable presumption of reasonableness on appeal. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). But "there is no presumption of *unreasonableness* that attaches to a sentence that varies from the range." *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006). In other words, if a sentencing judge imposes a sentence outside the guideline range, the Seventh Circuit will not presume that sentence to be unreasonable. Instead, the court of appeals will examine whether and to what extent that sentence conforms to the § 3553(a) factors. *See Cunningham*, 429 F.3d at 675 ("Whether a sentence is reasonable depends on its conformity to the sentencing factors set forth in 18 U.S.C. § 3553(a)(2).") (citing *Booker*, 543 U.S. at 259-60).

### C. Post *Booker* Reductions Are Not Limited by Case Law or Restrictive Guideline Language

After *Booker*, judges are no longer limited by the warnings within the guidelines that discourage or prohibit certain facts from consideration. Congress has clearly stated that "*[n]o limitation* shall be placed on the information concerning the background, character, and conduct"

of the defendant at sentencing. 18 U.S.C. § 3661 (emphasis added). *Booker* itself cites this section of the SRA. *Booker*, 543 U.S. at 251. Therefore, even if the guidelines say that a judge cannot give a traditional downward departure for lack of guidance as a youth, § 3661 authorizes a post-*Booker* sentence reduction based on this exact same fact, as long as such a reduction furthers one of the § 3553(a) purposes of sentencing.

Moreover, judges are no longer limited by all of the pre-*Booker* case law restricting and limiting traditional downward departures. "[A]fter *Booker* what is at stake is the reasonableness of the sentence, not the correctness of the 'departures' as measured against pre-*Booker* decisions that cabined the discretion of sentencing courts to depart from Guidelines that were then mandatory." *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005). In addition, a sentence that would not have been appropriately reached by a departure before *Booker* may nevertheless be a reasonable sentence after *Booker*. *See United States v. Castro-Juarez*, 425 F.3d 430, 436 (7th Cir. 2005).

### D. Guideline Sentencing May Negate § 3553(a) Factors.

If district judges simply impose guideline sentences, they may violate the Supreme Court's and Congress's directives and neglect significant 3553(a) factors that are not taken into account by the guidelines. The Sentencing Commission itself admits that it did not base the offense levels or the sentencing table on the § 3553(a) requirement to impose the minimally sufficient sentence, or on the purposes of punishment in § 3553(a). *See* United States Sentencing Commission, *Guidelines Manual* (hereinafter "USSG"), § 1A1.1, Part A (explaining that choosing among the different purposes of criminal punishment "would be profoundly difficult").

Instead, the Sentencing Commission explains, it based its sentencing scheme on a survey of past sentencing practices. *See id.* ("[T]he Commission has sought to solve both the practical

8

and philosophical problem of developing a coherent sentencing system by taking an empirical approach."). A guideline sentence also does not necessarily take into account the defendant's history and characteristics, many mitigating circumstances of the offense, or the need to provide restitution to victims, among other things.

### E. A Defendant's History and Characteristics Can Justify a Reduced Sentence Post *Booker*

In *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006), the Seventh Circuit confirmed that a defendant's history and character are relevant at sentencing and may alone be grounds for a reduced sentence, if such a sentence meets the § 3553(a) purposes of punishment. The court held that Baker's history of employment, educational background, religious background, and youth all justified a reduced sentence, because "[t]he court's consideration of these facts . . . coincides with the sentencing factors specified in § 3553(a)." *Id.* at 992.

*Baker* means that a reduced sentence may also be justified by other aspects of the defendant's history, such as the defendant's responsibilities to children or sick relatives, the defendant's traumatic childhood, any abuse the defendant suffered as a youth, and the defendant's mental health. The Seventh Circuit has also held that after *Booker*, a judge may give factors relevant to a defendant's *character*, such as the defendant's positive contributions to the community, "more weight than the Guidelines themselves would have allowed." *United States v. Rose*, 435 F.3d 735, 737 (7th Cir. 2006).

Courts must give defendants the "opportunity to draw the judge's attention to any factor listed in section 3553(a) that might warrant a sentence different from the guidelines sentence." *United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005). In entering the sentence, the judge must consider the sentencing factors in § 3553(a), *United States v. Re*, 419 F.3d 582, 583 (7th Cir. 2005), and "articulate the factors that determined the sentence that he has decided to

impose." *Dean*, 414 F.3d at 729. Explicit fact finding on the factors influencing a decision to exceed the guideline range is required where a particular fact is contested and "may be decisive to the choice of sentence." *Dean*, 414 F.3d at 730.

### III.     Advisory Guideline Range

Pursuant to the presentence report ("PSR"), with an adjusted offense level of 30 on both counts and a Criminal History Category I, Proano has an advisory guideline range of 121-151 months of imprisonment.

The Government's sentencing memorandum includes an additional four level adjustment for "obstruction of justice." The government suggests that Mr. Proano willfully obstructed or impeded the administrative of justice and thus, according to USSG §3C1.1, a two-level adjustment is appropriate for each TRR completed. Pursuant to the Government's version of events, this adjustment appears to be based on the purported falsification of the tactical response reports ("TRR") and that Mr. Proano's purpose in providing false information on the TRR was to obstruct or impede any subsequent criminal investigation into the offense. Mr. Proano objects to this adjustment and asserts that none of the information contained in his TRRs supports a finding that he willfully obstructed or impeded the administration of justice.

Furthermore, the presentence report ("PSR") does not find the Government's argument availing. The PSR suggests that Mr. Proano submitted his TRR statements based on his perception of the situation and not with the intention to make false statements, make an investigation less likely, or to mislead an investigation. Additionally, the PSR notes pursuant to USSG §3C1.1, App. N. 2, the Court should be cognizant of the fact that inaccurate information may result from "confusion, mistake, or faulty memory," and does not always merit an enhancement for obstruction of justice. USSG §3C1.1.

In order for the adjustment to withstand scrutiny, Mr. Proano must have acted with the specific intent to obstruct justice. *U.S. v. Ewing*, 129 F.3d 430, 434 (7th Cir. 1997). The manner in which Mr. Proano populated his TRR reports in no way equates to a specific intent to obstruct justice. Regarding the TRRs, there was no evidence presented that Mr. Proano was attempting to cover up his actions in relation to Mr. Bates and Mr. Hemmans by populating the TRRs in the manner in which he did. In fact, if Mr. Proano was attempting to cover up his actions, an argument could be made that he would not have even submitted either TRR.

## IV. Downward Variance from Advisory Guideline Range

Although the advisory guideline range is 121-151 months, Mr. Proano urges this Court to sentence him below that range by determining the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). In doing so, this Court should of course consider the guideline range, as it is required to do, but reject that range as too high. As will be discussed in more detail below, a number of factors support a downward variance from the advisory guideline range.

### A. Consideration of § 3553(a) Factors Counsel Against Sentencing Within the Guideline Range.

Since *Booker*, the guideline range is but one factor of many to be considered under 18 U.S.C. § 3553(a). *See Booker*, 543 U.S. at 249 (relying on § 3553(a)(1)'s text stating that court will consider "the nature and circumstances of the offense and the history and characteristics of the defendant."); *see also United States v. Ranum*, 354 F. Supp. 2d 984, 985 (E.D. Wis. 2005) (Adelman, J.). The § 3553(a) factors justify a sentence beneath the advisory guideline range.

#### 1. Nature and Circumstances of the Offense

As the judge that presided over trial, this Court is well acquainted with the facts of this case and Mr. Proano. On 22 December 2013, Chicago Police Officers Kenneth Flaherty and Jonathon Morlock, observed a Toyota driving at a high rate of speed eastbound out of the north

alley of 95th Street and then southbound onto LaSalle Street. Officers Flaherty and Morlock turned northbound onto LaSalle Street, causing their squad car and the Toyota to face each other. The driver of the Toyota, Mr. Delton Bates, left the car in drive, exited the vehicle, and fled. Officer Morlock pursued Mr. Delton Bates on foot. The Toyota continued to drive forward and stopped moving after it struck and became stuck between Officers Flaherty and Morlock's squad car and a gold-colored Saturn. Both vehicles sustained damage.

Officers Proano and Guy Habiak were in the area of 95th and the Dan Ryan when they heard Officer Flaherty call for assistance. Around 17:05 hours, a dispatch operator went over the air and stated, "[g]o ahead unit with an emergency. . . [g]ive the emergency unit the air. Go, go ahead, sir. Does anyone know that voice?" Next, Officer Flaherty comes over the air, in a distressed tone, shouting, "I need a car, 95 and LaSalle right now. I need it my partner's on foot. I think it's a stolen car. . . I don't know where he went. My partner's on foot." At the time Proano responded to the scene, he knew that it was an emergency situation in a high crime, high gang, and high narcotics sales area, that it involved a suspected stolen vehicle, that Officer Flaherty's partner was on foot chasing an offender, and that Officer Flaherty did not know where his partner went.

Officers Proano and Habiak turned from 95th Street northbound onto LaSalle Street. Officer Proano exited his squad, observed Officer Flaherty on the passenger side of the Toyota, five teenagers in the vehicle, and an individual, now known as Jaquon Grant, wedged in between the front passenger door of the Toyota and another vehicle parked alongside of the curb. Mr. Grant yelled for help. Numerous verbal commands were given for the occupants to show their hands, to which the occupants ignored. Delqunatis Bates admitted that he heard the police officers say, "Stop, let me see your hands" but ignored those commands because he was trying to

escape. Another occupant, Mr. Kevon Brown, attempted to flee from the vehicle and was ordered to remain in the vehicle by Officer Flaherty. Mr. Brown also conceded at trial that he heard a police officer yelling at him to get back in the vehicle and that everyone in the vehicle was screaming. Mr. Brown failed to comply with the officer's lawful order and attempted to flee from the Toyota a second time. He became wedged in the door and repeatedly yelled, "I'm stuck."

Mr. Delquantis Bates then leaned over to the front driver's seat and pressed the accelerator with his hand. The engine revved sounding as though the gas pedal was all the way to the floor, but initially did not move. Within a split-second, the Toyota reversed at a "high rate of speed" the wrong way (northbound) down LaSalle. Simultaneously, a weapon hit the grounds and someone says "Gun, Gun." Dash cam footage depicts the Toyota reversing at a high rate of speed with Mr. Brown hanging out of rear driver side.

Proano observed Kevon Brown partially hanging out of the vehicle near the rear driver's side as the vehicle fled in reverse. Fearing for Mr. Brown's safety, Proano discharged his firearm at the driver of the vehicle in an attempt to stop the driver, Mr. Delquantis Bates, from operating the vehicle and thus injuring Mr. Brown as he hung out of the window. He began firing immediately after the vehicle fled in reverse. Based on the totality of the circumstances, Proano's actions were justified as he reasonably feared for Mr. Brown's life, when Mr. Bates began driving in reverse, putting Mr. Brown's life in danger of great bodily harm.

Although the government attempted to characterize Mr. Brown's retreat from the Toyota as "hopping out," his testimony at trial was the opposite. At trial, Mr. Brown testified that the Toyota turned and pivoted which caused him to "fly out." The Toyota then continued to drive forward, hit a light pole, which caused it to stop moving. The government's claim that

approximately half of defendant's 16 bullets were fired at the Toyota before Kevon Brown got out of the car was never proven at trial. The government also did not establish that the remaining 8 bullets were fired as the car pivoted and then rolled "slowly to a stop. . ." There was no expert testimony at trial and without expert testimony on the trajectory of a bullet, video footage is not enough to conclusively establish where and at what point Proano was when he fired his gun. The government disguises inferences as facts. More, the inferences made are not supported by the evidence.

The government's first witness, Officer Flaherty, agreed that Mr. Bates actions placed Mr. Brown in danger of death or great bodily harm. Officer Flaherty observed the rear passenger hanging out of the car as it fled in reverse and agreed with Proano's belief that Mr. Brown was in danger of receiving death or great bodily harm. This is significant because the evidence adduced during the government's case in chief showed that Illinois law allows officers to use deadly force in an attempt to prevent death or great bodily harm to another. This is precisely the reason Officer Proano fired his weapon. He was fearful that the deadly weapon, here the Toyota, would harm Mr. Brown by death or significant injury. Proano told detectives that he was in fear for the life of Mr. Brown and fired his weapon at the driver of the vehicle. This is important because the government wants to characterize Proano's actions as shooting at the Toyota as opposed to the driver. That is not true. He aimed his firearm at the driver of the vehicle in an attempt to neutralize the threat.

## 2. Defendant Proano's History and Characteristics

Subparagraph (1) of 18 U.S.C. § 3553(a) requires courts to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Proano is 42 years old. His father, a machinist, is 76-years-old and his mother, who is in her mid-60's, is a retired seamstress. (PSR ¶ 74). Proano is one of three children, having an older sister, Gladys, and a younger brother, Johnny. (PSR ¶ 75). Proano enjoys a fine relationship with both of his siblings, but is closer to his brother, Johnny. *Id.* Proano came to the United States from Ecuador as a small child. (PSR ¶ 77). He is married to Veronica Gonzales, whom he met in high school, and have three children, ages 18, 10, and 6 years old. (PSR ¶¶ 78, 79). Proano enjoys spending time with his children, walking the younger two children to school in the morning and picking them up in the afternoon.

Proano's marriage is very strong and he serves as an exceptional father to his three children. (PSR ¶ 80). Both he and his wife continue to be reflective about the situation and believe it is best to be forward thinking. (PSR ¶ 80). Proano is concerned and worried but tries to remain calm and strong because breaking down would not be beneficial to his children. (PSR ¶ 89).

Proano began working as a Chicago Police Officer in October of 2006. During Mr. Proano's time as a Chicago Police Officer he received 121 complimentary marks on his record. The complimentary marks included 97 honorable mentions, 6 department commendations, 4 deployment operations center awards, 3 complimentary letters, 2 attendance recognition awards, 2 emblem recognitions for physical fitness, an honorable mention ribbon award, a top gun arrest award, Superintendent Award of Valor, unit meritorious performance award, presidential election deployment award in 2008, NATO summit service award and 2009 crime reduction letter.

The prestigious Superintendent's Award of Valor is granted for an act of outstanding bravery or heroism by which the member has demonstrated in great degree the characteristics of

15

selflessness, personal courage, and devotion to duty. Mr. Proano was awarded this medal for his heroism when he shot an armed felon who was threating the life of a fellow officer. The top gun arrest award is granted to the sworn member who, in the performance of his duty during one police period, warrants recognition from the Department for his exceptional commitment to the recovery of illegal firearms. Mr. Proano received this award after having the highest number of incidents during one police period which led to arrestees being charged with firearms-related offenses.

During the time his matter was pending in federal court, Proano briefly worked in an Amazon Warehouse located in Morton Grove, Illinois. (PSR ¶ 100). In February of 2017 he stopped working at Amazon and obtained work as a ramp supervisor for Swissport USA. (PSR ¶ 99). Proano continued to work for Swissport USA until August 30, 2017, when he resigned from that position after his conviction in the instant offense because the employer policy prohibited convicted felons from the area in which he worked. (PSR ¶ 99).

### B. The Sentence Proposed by Mr. Proano Provides Just and Appropriate Punishment

The central task facing this Court is to craft a sentence for Mr. Proano that is "sufficient but not greater than necessary," to satisfy the purposes of sentencing described in 3553(a)(2). Commentators note that this provision, which was originally part of the House sentencing reform bill and was later added to the Senate resolution and adopted in committee, "is not just another 'factor' to be considered along with others set forth in Section 3553(a)—it sets an independent limit on the sentence a court may impose." David L. McColgin & Brett G. Sweitzer, *Grid & Bear It*, 29 Champion 50, 50 (2005); *see also United States v. Foreman*, 436 F.3d at 644 n.1 (6th Cir. 2006) ("[A] district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2).") (quoting 18 U.S.C. § 3553(a)),

*overruled on other grounds, United States v. Young*, 580 F.3d 373 (6th Cir. 2009); Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 83 (2005) (stating "the structure of section 3553(a)," which lists the parsimony principle first, suggests that this principle "set[s] overall limits on the crime-control and other purposes which follow").

This provision requires courts to impose the minimum necessary to accomplish the purposes enumerated in paragraph (2). Paragraph (2) lists those purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). These purposes, of course, substantially correspond to the four traditional goals of criminal punishment: retribution, deterrence, incapacitation, and rehabilitation. The Guideline sentence in this case far exceeds that is "necessary." As will be explained in more detail below, the goals of sentencing and justice are best served by a more temperate term of supervised release, coupled with substantial community service.

### 1. The Seriousness of the Offenses, Respect for the Law, and Just Punishment Are Reflected in the Recommended Sentence

An appropriate sentence must "reflect the seriousness of the offense, . . . to promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. §3553(a)(2)(A). Mr. Proano submits a balanced sentence here, which would include significant restrictions on Mr. Proano's liberties. As noted, the offense was not the kind of "willful" violation that would warrant a term of incarceration for a first-time offender. A sentence that includes a period of home confinement, monitored by the Probation Office and the Court, would significantly curb

Mr. Proano's liberty. Home confinement would serve to address the seriousness of the offense while still paying respect for the law because of the serious limitations.

Additionally, Mr. Proano proposes a sentence that includes mandatory community service as directed by Court. As a form of punishment, community service has "the advantages of permitting [the defendant] to work productively with others. . . rather than. . . [b]e[ing] warehoused in a prison." *United States v. Milken*, 1990 WL 264699 at *5 (S.D.N.Y Nov. 21, 1990).

### 2. Deterrence

The second goal of a just sentence is to deter others from committing similar crimes. *See* 18 U.S.C. 3553(a)(2)(B). It is not necessary to imprison Mr. Proano in order to accomplish deterrence. Courts have recognized that the devastating financial and personal consequences that accompany highly publicized indictments and investigations like this one have a substantial deterrent effect. In this matter, Mr. Proano was the subject of multiple news reports and articles. News agencies could not wait to capitalize on Mr. Proano's convictions, further fueling the anti-police rhetoric sweeping the nation. The day following the guilty verdict Mr. Proano, his wife, and three children woke up to his photo, plastered on the front page of the Sun-Times, with a caption in large bold font stating, "UNREASONABLE FORCE." As noted in the Probation Office's Sentencing Recommendation, Mr. Proano, in many ways, has been greatly punished for his actions. As a first-time offender, Mr. Proano has been arrested, indicted and convicted. He has been publicly humiliated in his community. He lost his job and the reputation he spent a lifetime building. The fate suffered by Mr. Proano is one that nobody would choose for themselves and provides a substantial deterrent effect on prospective offenders.

An appropriate sentence provides "the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. 3553(a)(2)(D); *e.g.*, 28 U.S.C. 994(j). A sentence of incarceration in a federal prison serves none of these goals. A more tempered sentence of home confinement and a community service obligation certainly does. Mr. Proano is an intelligent, motivated, and resilient man.

### 3. Protect Public from Further Crimes of Defendant

Concerns regarding recidivism are zero. Mr. Proano will never work in law enforcement again as a result of this conviction. Therefore, a term of incapacitation to keep him from committing further offenses, is not necessary. In *Gall*, the Supreme Court affirmed the district court's sentence of 36 months' probation, despite an advisory guideline range of 30 to 37 months, based, in part, on issues similar to those in this case. *Gall*, 552 U.S. at 43-44. The district court concluded that a term of imprisonment was not necessary to deter the defendant from engaging in future criminal conduct or to protect the public from any future criminal acts by the defendant. *Gall*, 552 U.S. at 59. The Supreme Court rejected the Eighth Circuit's conclusion that a sentence of probation was inadequate and beyond the realm of available sentencing choices and emphasized the fact that a sentence of probation is in fact punishment and is not merely "an act of leniency." *Gall*, 552 U.S. at 44.

The sentence Proano is requesting of the Court is a serious one, befitting the offense of conviction. As the Court observed in *Gall*, a felony conviction and a sentence of probation, together with special conditions, constitutes a serious punishment.

While custodial sentences are qualitatively more severe than probationary ones, offenders sentenced to probation are nonetheless subject to conditions which restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) (inherent in the very nature of probation is

that probationers do not enjoy the absolute liberty to which every citizen is entitled). For example, probationers may not leave the judicial district, move, or change jobs without notifying, and, in some instances, receiving permission from their probation officer or the court. *Id.* In addition, they must report regularly to their probation officers, permit unannounced visits to their home, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. *See* U.S.S.G. § 5B1.3.

Furthermore, as a probationer, Proano will be subject to individual "special conditions" imposed by the court. Finally, a probationer always faces the possibility of harsh consequences if a condition of their probationary term is violated. *See* Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) (probation is not merely letting an offender off easily).

If this court decides to impose a period of home confinement as a condition of probation, Proano will be confined to his home. He will not be allowed to travel, and will not be able to accompany his children to doctor appointments or places in the community. He would not be allowed to leave his home to visit friends, see a movie, eat in a restaurant, sit in the park, shop at the mall, or do any of the small acts that provide so much of the pleasure and enjoyment of life and which the rest of us take for granted. He will, for all practical purposes, be a prisoner in his home and not be able to leave except for work or medical reasons.

In addition, as the court is more aware of than most in society, a federal conviction is a brand that will remain with Proano forever. Moreover, a federal conviction has serious and severe consequences on not just Proano, but also his wife, three children, siblings, and parents. Such punishment provides a permanent reminder of Proano's wrongdoing, that carries with it, a high degree of guilt and shame.

#### 4.  Rehabilitation

Proano's rehabilitation will come in the form of working as a condition of probation. If he is sent to prison, he will not be able to be rehabilitated. Here, Proano's rehabilitative needs require a sentence of probation or home detention, during which he can seek work to provide for his family. As the parsimony provision commands, this Court should impose the minimum sentence necessary to accomplish the rehabilitative purpose of criminal punishment.

#### 5.  Restitution 3553(a)(7)

The Government seeks restitution to the victims of the offenses in an amount to be determined by the Court. The PSR indicates that restitution is not recommended. Mr. Proano asserts that payment of restitution in this matter would tip the balance and be a punishment greater than necessary. Mr. Proano has lost his job, suffered private and very public humiliation. While the jury found that Mr. Hemmans and Mr. Bates suffered bodily injury, the Government indicated that it believed neither victim was interested in speaking with the probation department. Mr. Proano respectfully requests the Court not order restitution.

#### Conclusion

The timing of Mr. Proano's charge and trial could not have been worse for him. After months of protests and demonstrations denouncing the Chicago Police Department (CPD), the Department of Justice conducted a comprehensive patterns and practice investigation of the CPD and its mistreatment of minorities.  In one of its findings, the DOJ concluded that Chicago Police officers consistently fired at fleeing vehicles during the time period referenced in the DOJ report. None of those officers were disciplined by CPD, let alone charged with a crime by the federal government. It would be naïve to ignore the facts here and fail to recognize that Mr. Proano served as somewhat of a scapegoat in this case. The situation was at a boiling point and Mr.

Proano was sacrificed to the furor. It would be unfair to allow Mr. Proano to shoulder the blame and penalty of alleged decades of mistreatment by the Chicago Police Department as a whole. This Court should sentence Proano to the minimum sentence necessary to accomplish the goals of criminal punishment under § 3553(a). That minimum sentence is three years of probation, a fine in the amount of $3,000, and the mandatory $100 special assessment. In the event this Court determines that a more severe sentence is necessary to accomplish the goals of criminal punishment, Mr. Proano urges this Court to give him a surrender date in January 2018, so he can spend the holidays with his wife, three children, and the rest of his family.

Respectfully submitted,

By:     */s/ Daniel Q. Herbert*
        Daniel Q. Herbert
        Elizabeth Fleming
        Daniel Q. Herbert & Associates
        206 S. Jefferson, Suite 100
        Chicago, IL 60661
        (312) 655-7660

Dated: October 23, 2017